IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| The City of Myrtle Beach, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 4:08-cv-01183-TLW-SVH |
| | ) | |
| United National Insurance Company, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

# ORDER

This action was removed to this Court from the Court of Common Pleas for Horry County, South Carolina, on April 3, 2008. (Doc. #1). On February 5, 2010, the defendant United National Insurance Company filed a motion for summary judgment. (Doc. #55). The plaintiff filed a response in opposition on February 17, 2010. (Doc. #57). The defendant filed a reply to the response on March 1, 2010. (Doc. #59). This Court held a hearing on this matter on July 30, 2010. The Court has considered the motions, memoranda, and arguments of the parties, and this matter is now ready for disposition.

## FACTS

This action involves a dispute between the City of Myrtle Beach and its former insurer carrier over legal costs associated with a lawsuit filed against the city. The defendant United National Insurance Company ("United National") issued a comprehensive general liability policy to the City of Myrtle Beach, South Carolina, which was effective from December 31, 1997 through July 1, 1999. The record indicates that the policy was renewed on multiple occasions, and that the final policy expired on July 1, 2004, at which time the city switched insurance carriers.

In prior years, the City of Myrtle Beach was home to two annual motorcycle rallies held during the month of May. The first rally held in May was commonly known as "Harley Week." A large number of the participants that attended this rally were Caucasian. The second rally held later in May was known as "Bikefest" or "Black Bike Week." Many of the participants that attended the Bikefest event were African-American. In 1998, the City of Myrtle Beach began implementation of a new system of traffic patterns during the city's two motorcycle rallies. The new traffic patterns provided for two-way traffic flow on Ocean Boulevard, one of the city's main roads, during Harley Week. In contrast, the traffic patterns during Bikefest allowed only one-way traffic on Ocean Boulevard, and exit points and parking were restricted along Ocean Boulevard.

On December 20, 2003, the NAACP filed suit on behalf of ten individual plaintiffs against the City of Myrtle Beach asserting that the adoption of separate traffic patterns and law enforcement practices for each respective rally was discriminatory and constituted a violation of civil rights. The NAACP sought damages as well as a permanent injunction. A temporary injunction was entered in the case on May 9, 2005. On February 6, 2006, a settlement agreement between the NAACP and the City of Myrtle Beach was approved in the underlying case. The settlement agreement included provisions regarding the future implementation of traffic patterns and police practices at the two motorcycle rallies, provided for law enforcement training, and provided for future meetings between the city and the NAACP prior to the motorcycle rallies. The City of Myrtle Beach did not agree to pay any damages to the individual plaintiffs in connection with the settlement of the case.

The City of Myrtle Beach filed the action now before the Court in 2008, seeking to recover fees and costs associated with the defense of the underlying suit pursuant to the comprehensive general liability policy issued to the city by United National. The city has filed a claim for breach

of contract and a claim for bad faith in connection with the insurance policy issued by United National. The record indicates that the city incurred approximately $637,530.15 in defense expenses and expert costs in defending the NAACP suit. It is undisputed that the policy provides a $75,000 self-insured retention that must be met by the city prior to obtaining coverage under the policy. After the filing of this suit, United National paid the city $346,734.41 in connection with its claims. After accounting for the self-insured retention, the record reflects that approximately $215,795.74 remain in dispute in connection with the breach of contract claim filed by the city.

## SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), the defendant is entitled to summary judgment if the pleadings, responses to discovery, and the record reveal that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). As the party seeking summary judgment, the defendant bears the initial responsibility of informing this Court of the basis for its motion. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This requires that the defendant identify those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of genuine issues of material fact. Celotex, 477 U.S. at 323; see also Anderson, 477 U.S. at 249.

Though the defendant bears this initial responsibility, the plaintiff, as the nonmoving party, must then produce "specific facts showing a genuine issue for trial." Fed R. Civ. P. 56(e); see Celotex, 477 U.S. at 317. In satisfying this burden, the plaintiff must offer more than a mere

3

"scintilla of evidence" that a genuine issue of material fact exists, Anderson, 477 U.S. at 252, or that there is "some metaphysical doubt" as to material facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rather, the plaintiff must produce evidence on which a jury could reasonably find in its favor. See Anderson, 477 U.S. at 252.

In considering the defendant's motion for summary judgment, this Court construes all facts and reasonable inferences in the light most favorable to the plaintiff as the nonmoving party. See Miltier v. Beorn, 869 F.2d 848 (4th Cir. 1990). Summary judgment is proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." Matsushita, 475 U.S. at 587 (1986) (internal quotations omitted).

## **DISCUSSION**

### a. Breach of Contract

As a basis for its motion for summary judgment, United National asserts that the comprehensive general liability policy issued to the City of Myrtle Beach does not provide coverage for the approximately $215,795.74 in fees and costs that remain in dispute. United National asserts two positions that warrant summary judgment in its favor. First, United National asserts that the policy does not provide coverage for fees and costs incurred in connection with claims for prospective injunctive relief that are outside the policy period. United National further contends that the remaining sums represent fees associated with law enforcement activity that occurred after the expiration of the policy period. Second, United National argues that the remaining sum represents fees and costs that do not constitute "damages" under the terms of the insurance policy or under South Carolina law.

The comprehensive general liability insuring agreement at issue in this case provides:

4

> The Company agrees, subject to the policy limitations, terms and conditions, to indemnify the ASSURED for all sums which the ASSURED is legally obligated to pay by reason of the liability imposed upon the ASSURED by law or assumed by the ASSURED under contract or agreement, ***for damage*** direct or consequential, and expenses, all as more fully defined by the term ULTIMATE NET LOSS, on account of ***PERSONAL INJURY***, BODILY INJURY including death at any time resulting therefrom . . . and/or PROPERTY DAMAGE or the loss of use thereof, ***arising out of any OCCURRENCE*** from any cause including HOST/LIQUOR LIABILITY, INCIDENTAL MEDICAL MALPRACTICE, or ***liability arising out of LAW ENFORCEMENT ACTIVITIES***, happening during the PERIOD OF INSURANCE"

(Ins. Policy. at p. 26, Doc. #55, Exhibit Q) (emphasis added).

The specific terms "Law Enforcement Activities," "Personal Injury," and "Ultimate Net Loss" are further defined as follows:

> 10. LAW ENFORCEMENT ACTIVITIES means the activities of any ASSURED while acting as a law enforcement official, officer, auxiliary officer, employee or volunteer of a law enforcement agency or a department of the ASSURED or other authorized employment of a law enforcement nature.
>
> . . .
>
> 14. PERSONAL INJURY… means any Injury other than BODILY INJURY or PROPERTY DAMAGE arising out of the following:
>
> Mental Anguish, Shock, Sickness, Disease, Disability or Death not arising from Physical Injury. It also means Wrongful Entry, Wrongful Eviction, Wrongful Detention, Malicious Prosecution, Humiliation, Misappropriation of Advertising Ideas, Invasion of Rights of Privacy, Libel, Slander or Defamation of Character, Piracy and any Infringement of copyright or of Property, Erroneous Service of Civil Papers, Assault and Disparagement of Property. In addition, as respects LAW ENFORCEMENT ACTIVITIES, PERSONAL INJURY also includes False Arrest, False Imprisonment, and Detention, and any resultant claims arising out of discrimination and civil rights violations in conjunction with these LAW ENFORCEMENT ACTIVITIES.
>
> . . .
>
> 22. ULTIMATE NET LOSS means the total sum which the ASSURED is obligated to pay because of loss or damage under any Section of this policy, either through

5

adjudication or compromise, after making proper deductions for all recoveries and salvages.

ULTIMATE NET LOSS also includes hospital, medical and funeral charges and all sums paid as salaries, wages, compensation, fees, expenses of doctors, nurses, and legal, premium on attachment, appeal or similar bonds . . . expenses of lawyers and investigators and other persons for litigation, settlement, adjustment and investigation of claims and SUITS which are paid as a consequence of any occurrence covered hereunder.

(Ins. Policy. at pp. 15-17, Doc. #55, Exhibit Q).

United National asserts that the unambiguous policy language provides coverage only for personal injury stemming from an occurrence that happened within the policy period, or for law enforcement activities that occur during the policy period. United National asserts that the policy does not provide coverage for the remaining $215,795.74 in fees and costs that were generated in connection with a claim for prospective injunctive relief. United National contends that the disputed fees were not generated in connection with the underlying claims for past legal damages, but rather in connection with the plaintiffs' attempt to force the city to adopt non-discriminatory traffic patterns and law enforcement practices at future Bikefest events. United National contends that this request for future relief, which was to occur after the expiration of the policy, is distinct from any claim for damages associated with the city's prior enforcement of the Bikefest traffic patterns.

The Court notes that the underlying lawsuit filed by the NAACP in 2003 included claims for both legal damages and for permanent injunctive relief. These claims stemmed from the city's 1998 implementation of allegedly discriminatory traffic patterns and law enforcement practices in connection with the annual Bikefest rally. On February 24, 2005, as the 2005 Bikefest rally approached, the plaintiffs in the underlying suit filed a motion for preliminary injunction to enjoin the City of Myrtle Beach from employing a one-way traffic pattern for the 2005 Bikefest rally. On

May 9, 2005, this Court issued an Order granting the plaintiffs' motion for preliminary injunction to the extent that the City of Myrtle Beach would be required to maintain a substantially similar traffic pattern during both Harley Week and Bikefest.[1] The record indicates that several months after the Court issued this ruling, the parties mediated the underlying case. At this mediation in August of 2005, the parties reached a tentative settlement. A final settlement was ultimately approved by this Court on February 6, 2006.

It is undisputed that the policy at issue provided coverage for a portion of the expenses generated in connection with the NAACP suit. Indeed, United National has already paid $346,734.41 in defense fees and costs associated with the underlying suit. United National has grouped the fees and costs which remain in dispute into four separate categories. The first category includes $63,228.50 "in fees incurred to defend the NAACP's Motion for Preliminary Injunction and the city's appeal of same." (Summ. J. Mot. at p. 14, Doc. #55). The second category includes "Mediator fees totaling $8,395.68." (Summ. J. Mot. at p. 14, Doc. #55). The third category includes $45,804.17 "for fees and expenses of defense counsel for the period of June 1, 2005 to February 2007 which was after the ruling on the Motion for Preliminary Injunction and during and after settlement where the only agreed relief was injunctive relief, not damages." (Summ. J. Mot. at pp. 14-15, Doc. #55). The final category includes $98,367.39 in expert fees incurred prior to and shortly after the ruling on the motion for preliminary injunction, which relate to issues including traffic and pedestrian observations and assessment of traffic management plans for upcoming bike rallies. (Summ. J. Mot. at p. 15).

---

[1]This Court noted that the city would be free to determine whether it would implement a one-way, two-way, or another traffic pattern for both events.

In response to United National's position, the City of Myrtle Beach contends that the disputed expenses cannot be separated from the underlying damages claims for which the policy clearly provided coverage. The city asserts that the latter three categories of disputed fees and costs – mediator fees, expert fees, and defense expenses incurred following the ruling on the motion for preliminary injunction – were generated in connection with the underlying suit as a whole. The city asserts that these expenses cannot be neatly allocated between the NAACP plaintiffs' claims for damages and the claims for injunctive relief. The city further asserts that United National's attempt to characterize the underlying suit as one that was focused primarily on future injunctive relief is erroneous, and that the individual NAACP plaintiffs maintained their demand for $2.8 million in compensatory damages up to and during the mediation of the case. The city notes that, although it ultimately succeeded in reaching a compromise with the individual NAACP plaintiffs which did not involve the payment of monetary damages, the claims for substantial monetary damages remained viable throughout the majority of the case. Therefore, the city contends that it would be error for the Court to classify the latter three categories of damages as expenses that can be allocated solely to the NAACP plaintiffs' claims for prospective injunctive relief.

The Court has carefully reviewed the facts of the underling NAACP suit in connection with the insurance policy at issue in this case. The Court notes that the language of the United National policy is broad. The policy provides coverage "for damage direct or consequential, and expenses" stemming from either personal injury arising out of any occurrence or from liability arising out of law enforcement activities happening during the period of insurance. (Ins. Policy at p. 26, Doc. #55, Exhibit Q). In defining personal injury, the policy specifically notes that "as respects LAW ENFORCEMENT ACTIVITIES, PERSONAL INJURY also includes False Arrest, False

Imprisonment, and Detention, and any resultant claims arising out of discrimination and civil rights violations in conjunction with these LAW ENFORCEMENT ACTIVITIES." (Ins. Policy at p. 16, Doc. #55, Exhibit Q). Ultimate Net Loss is further defined to include the "total sum which the [City of Myrtle Beach] is obligated to pay because of loss or damage . . . either through adjudication or compromise." (Ins. Policy at p. 17, Doc. #55, Exhibit Q). Thus, it is reasonable to conclude that the policy language clearly provides coverage for the NAACP plaintiffs' underlying claims for discrimination and civil rights violations stemming from the city's adoption of allegedly discriminatory traffic patterns and police practices within the period of insurance. The record indicates that the implementation of allegedly discriminatory traffic patterns by the City of Myrtle Beach in 1998 would qualify as an "occurrence" pursuant to the terms of the policy which would trigger coverage. The question of whether the NAACP plaintiffs' accompanying claims for injunctive relief are also covered requires a different focus in the analysis.

In reviewing the underlying NAACP lawsuit, the Court notes that the record does not indicate that the suit was focused primarily on prospective injunctive relief. Like many cases involving alleged civil rights violations by law enforcement, the NAACP plaintiffs included claims for both monetary damages and for permanent injunctive relief. The record indicates that a number of hours were devoted to litigating the motion for temporary injunctive relief. Further, after settlement efforts were conducted, with each side represented by former Chief Justices of the South Carolina Supreme Court, the case was resolved after the issue of preliminary injunctive relief had been decided. The case was fully resolved as to all issues at a relatively early stage in the proceedings following these significant negotiations. However, the motion for temporary injunctive relief was merely a component of the plaintiffs' overall claims – much more was at stake. At the time that the motion

for preliminary injunction was filed, the underlying suit had been pending for over one and one-half years. The motion for injunctive relief was filed shortly before the annual Bikefest rally was to be held, suggesting that the plaintiffs recognized that it was unlikely that all issues in the case would be permanently resolved prior to the upcoming Bikefest rally. The injunctive relief granted by this Court was an initial ruling that temporarily resolved one aspect of the case pending resolution of the underlying case and the issues in dispute. This Court announced a temporary ruling to be applied at the approaching bike rallies. The Court did not issue any definitive ruling as to the merits of the underlying claims in dispute.

In assessing the underlying suit, the Court notes that the claims for temporary injunctive relief were a corollary to the NAACP plaintiffs' claims for damages and permanent injunctive relief. The Court concludes that many of the expenses which remain in dispute cannot properly be allocated solely to the claims for injunctive relief. With regard to the mediator fees of $8,395.68; the $45,804.17 representing "fees and expenses of defense counsel for the period of June 1, 2005 to February 2007 which was after the ruling on the Motion for Preliminary Injunction and during and after settlement where the only agreed relief was injunctive relief, not damages;" and the $98,367.39 in "expert fees," the defendant has not established that it is entitled to summary judgment on the plaintiff's breach of contract claim. (Summ. J. Mot. at pp. 14-15, Doc. #55). The defendant: i) has not shown that these three categories of expenses are separate and distinct from the costs associated with the defense of the NAACP plaintiffs' claims for legal damages, and ii) has not shown that these expenses fall outside the insurance policy's broad coverage language.

The mediatiator fees were generated in an attempt to mediate all claims in the case, including the damages claims that were clearly covered under the policy. The fact that the damages claims

10

were resolved in favor of the city during the course of the mediation does not change the fact that the mediation was commenced in an attempt to resolve the entire suit – not just the claim for injunctive relief. With regard to the $45,804.17 in disputed fees that were generated following the ruling on the motion for preliminary injunction and prior to and during the settlement, the Court notes that the claims for damages were still viable after the Court's ruling on the motion for preliminary injunction. Further, the Court is not persuaded that the policy provides no coverage for the costs incurred in finalizing the settlement agreement merely because the settlement did not result in payment of the damages which were sought in the case. Finally, the record indicates that the expert fees at issue in this case were generated in connection with the defense of the underlying lawsuit as a whole. At the hearing on this matter, counsel for the city asserted that the experts were employed in an attempt to address the "disparate impact" element of the NAACP plaintiffs' discrimination claims. At best, the expert fees can only be allocated in part to the claims for prospective injunctive relief. However, even if the Court were to assume that the expert fees can be allocated in full to the defense of the claims for prospective injunctive relief, the motion would fail based on an analysis of what constitutes "damages" under South Carolina law. That analysis begins in the following paragraph. In conclusion, the Court finds that the defendant's motion for summary judgment on the plaintiff's breach of contract claim is denied as to the $8,395.68 in mediator fees; the $45,804.17 in defense fees following the ruling on the motion for preliminary injunction and during settlement; and the $98,367.39 in expert fees, because the defendant has not shown that these expenses fall outside of the insurance policy language at issue in this case.

United National has further asserted that $63,228.50 of the disputed fees can be tied directly to the sums "incurred to defend the NAACP's Motion for Preliminary Injunction and the city's

11

appeal of same." (Summ. J. Mot. at p. 14, Doc. #55). United National asserts that these fees incurred in defending claims for prospective relief fall outside of the policy. In support of this claim, United National cites to the Fourth Circuit's opinion in Ellett Bros., Inc. v. United States Fidelity & Guaranty Co., 275 F.3d 384 (4th Cir. 2001) ("Ellett Brothers"). In Ellett Brothers, the Fourth Circuit addressed a coverage dispute between a handgun manufacturer and its commercial general liability insurer. Id. The handgun manufacturer had been named in three suits filed by California municipalities and one suit filed by the NAACP attacking the manufacturer's sales and marketing practices. Id. at 386-87. The plaintiffs in each of the underlying suits in Ellett Brothers sought *only* injunctive relief, although the NAACP also sought an injunction requiring the manufacturer to contribute to a fund to supervise gun dealers as well as attorney's fees. Id. at 387. Notably, none of the suits sought compensatory or punitive damages. Id. The Fourth Circuit noted that it had "previously held that the term 'damages' in an insurance contract unambiguously means legal damages, and that '[a]s a general rule comprehensive general liability policies do not extend coverage to claims for equitable relief.'" Id. (citing Cincinnati Ins. Co. v. Milliken and Co., 857 F.2d 979, 981 (4th Cir. 1988)). Although the gun manufacturer highlighted the fact that the term "damages" was not defined within the insurance contract, the Fourth Circuit held that "because neither the South Carolina courts nor the parties to this contract have evinced any intent to deviate from the default rule established in Milliken, we hold the term 'damages,' as used in this contract, does mean legal damages only, and therefore does not extend to claims for equitable relief." Id. Again, the underlying suits against Ellett Brothers, Inc. involved only injunctive relief.

However, as conceded by United National at the hearing on this matter, this Court's analysis is guided by the South Carolina Supreme Court's decison in the more recent case of Helena

12

Chemical Co. v. Allianz Underwriters Ins. Co., 594 S.E.2d 455 (2004) ("Helena"). The plaintiff in Helena was a chemical company that was identified by the EPA as a "potentially responsible party" for soil contamination at three of its sites pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA). Id. at 456. Helena engaged in extensive cleanup efforts to remedy the soil contamination. Id. Helena then sought reimbursement from its insurers for the legal defense costs and the costs of conducting the environmental cleanups. Id. Helena's insurers denied coverage for the sums spent on the environmental cleanup efforts. Id. The trial court granted summary judgment, finding, in part, that the cleanup costs did not constitute "damages" under the language of the policies at issue. Id.

In examining the trial court's grant of summary judgment, the South Carolina Supreme Court discussed prior Fourth Circuit decisions in this area, noting that "the Fourth Circuit's logic contains an inherent paradox: although insurance policy terms are to be construed in their ordinary and usual way, the Armco and Milliken court both accorded the term 'damages' a narrow, technical meaning." Id. at 458 (citing Maryland Cas. Co. v. Armco, Inc., 822 F.2d 1348 (4th Cir. 1987); Cincinnati Ins. Co. v. Milliken and Co., 857 F.2d 979 (4th Cir. 1988)). The South Carolina Supreme Court noted that "[t]his goes against South Carolina precedent which holds that this Court must give policy language its plain, ordinary, and popular meaning." Id. The Court added, "[t]he plain, ordinary meaning of 'damages' is monies paid on an insured's loss," and that "[a]n 'ordinary' meaning of the term is not a legalistic one dependent on whether the damages are classified as legal versus equitable." Id. (internal citations omitted). The Court went on to hold that environmental cleanup costs can constitute "damages" pursuant to the language of an insurance policy, although the Court noted that a policy exclusion ultimately barred coverage in the case. Id. at 459-62.

13

Although United National has conceded that this Court is bound by the South Carolina Supreme Court's holding in Helena, and that Helena dictates the outcome in this case, it contends that the facts of the case do not dictate that its motion for summary judgment be denied. Rather, United National points to the concurring opinion of Judge Michael in Ellett Brothers. In his concurring opinion, Judge Michaels noted that, under South Carolina law, it appeared that the term damages "can include equitable relief in some instances," and that "[a]t the very least, the question is unsettled." Ellett Brothers at 389 (Michaels, J., concurring). However, Judge Michaels noted that "[r]egardless of the state of South Carolina law on the legal/equitable distinction, contract terms are nevertheless limited to their ordinary, plain meaning." Id. As Judge Michaels noted, "[t]he term 'damages' is ordinarily meant to include 'the estimated reparation in money for detriment or injury sustained.'" Id. at 390 (internal citations omitted). Judge Michaels then concluded that an injunction to abate a nuisance, like the injunctions sought in the four cases filed against Ellett Brothers, Inc., was "forward looking relief to prevent future harm, not relief to redress past harm," and thus did not constitute damages in the "ordinary sense" of the word. Id.

United National makes a similar argument in the case now before this Court. United National argues that equitable damages for the payment of environmental cleanup fees, similar to those addressed in Helena, serve to redress past damages. Therefore, United National contends, the fees associated with an environmental cleanup constitute damages in the traditional sense of the word. In contrast, United National argues that a forward-looking injunction designed to prevent future harm is a distinct category of equitable damages which does not constitute "damages" in the traditional sense of the word. In effect, United National asserts that Judge Michael's concurring opinion in Ellett Brothers is consistent with the South Carolina Supreme Court's holding in Helena.

14

United National further asserts that the facts of Helena do not dictate that the term "damages" within an insurance contract can necessarily encompass a claim for prospective injunctive relief under South Carolina law.

While United National's position is not without a degree of merit, the Court does not conclude that its position is consistent with South Carolina law. In Helena, the South Carolina Supreme Court expressly rejected the legal/equitable distinction when interpreting the phrase "damages" within an insurance contract, setting forth the analysis and conclusions previously discussed. The Court did not give any indication that this holding was limited to the facts of the particular case. In reaching this conclusion, the South Carolina Supreme Court specifically noted its agreement with the Maryland Supreme Court's holding that "[a]bsent an express provision in the document itself, insurance policy-holders surely do not anticipate that coverage will depend on the mode of relief, i.e. a cash payment rather than an *injunction*, sought by an injured party . . . [p]olicy-holders will, instead, reasonably infer that the insurer's pledge to pay damages will apply generally to compensatory outlays of various kinds, including expenditures made to comply with administrative orders or *formal injunctions*." Helena at 458 (emphasis added) (citing Bausch & Lomb, Inc. v. Utica Mut. Ins. Co., 625 A.2d 1021, 1032-33 (1993)). This analysis amplifies the analysis in Ellett Brothers in which only injunctive relief was sought. In the instant case, the request for injunctive relief was filed in connection with a claim for compensatory damages. The suit was premised on alleged civil rights violations that occurred at consecutive annual rallies, each held while a United National policy was in effect. The motion for preliminary injunction was filed in an attempt to prevent alleged civil rights violations in connection with an upcoming rally. As stated previously, the claims for equitable relief are directly tied to the claims for compensatory damages.

The insurance policy issued in this case provides broad coverage for expenses related to actions asserting claims for discrimination and civil rights violations against the insured. The policy does not clarify whether the coverage extends only to expenses incurred in defending claims for legal relief or to claims for both legal and equitable relief. Although the record reflects that United National has taken steps to clarify this issue through the use of a specific policy exclusion in other policies of insurance, including other policies issued to the City of Myrtle Beach, no such exclusion was included in the policy at issue in this case. Absent an indication of intent to the contrary, and based on the caselaw analyzed herein, the Court concludes that the claims for expenses incurred in connection with defending claims for injunctive relief stemming from alleged discrimination and civil rights violations which occurred during the coverage period are encompassed by the language of the insurance policy at issue in this case. Therefore, the Court concludes that United National's motion for summary judgment is denied as to the $63,228.50 in fees associated with defending the NAACP's motion for preliminary injunction.

### b. Bad Faith

United National also seeks summary judgment on the plaintiffs' second cause of action for bad faith in regard to the policy at issue in this case. In South Carolina, the elements of a claim for bad faith refusal to pay first party benefits under a contract of insurance include: "(1) the existence of a mutually binding contract of insurance between the plaintiff and the defendant; (2) refusal by the insurer to pay benefits due under the contract; (3) resulting from the insurer's bad faith or unreasonable action in breach of an implied covenant of good faith and fair dealing arising on the contract; (4) causing damage to the insured." Howard v. State Farm Mut. Auto. Ins. Co., 450 S.E.2d 582, 586 (1994) (citing Crossley v. State Farm Mut. Auto. Ins.,415 S.E.2d 393, 396-97 (1992)).

16

United contends that the record does not provide any evidence of bad faith, as United National had a reasonable basis for denying coverage for various expenses related to claims for prospective injunctive relief. United National's asserted basis for denying coverage as to these expenses is certainly based on a good faith interpretation of the law. The city asserts, however, that it was forced to file suit to obtain any payment under the policy. The city also notes that the initial payment of the undisputed sums did not come until five years after payment became due. The city further points to alleged misrepresentations made by United National to the city and to the third-party claims administrator regarding coverage under the policy. More specifically, the city asserts that United National erroneously claimed that the underlying NAACP suit was covered under a policy providing coverage to "Public Officials," which contained an express exclusion for claims involving injunctive relief. It later became apparent that the "Public Officials" policy did not apply to the NAACP suit.

When faced with a dispute over the reasonableness of an insurer's refusal to pay benefits, South Carolina courts have often submitted the issue of reasonableness to a jury for determination. <u>Varnadore v. Nationwide Mut. Ins. Co.</u>, 345 S.E.2d 711, 713-14 (1986) (insurer not entitled to directed verdict although insurer argued that its own investigation showed a reasonable basis to deny the claim, court noted that allowing directed verdict would "bind . . . insured to the findings and conclusions of the insurer's own independent investigation . . . effectually insulate the insurer from liability . . . and . . . foreclos[e] a jury's consideration of the insured's evidence of bad faith"); <u>Howard v. State Farm Mut. Auto. Ins. Co.</u>, 450 S.E.2d 582;, 451-52 (1994) (trial judge did not err in submitting question of whether insurance company's refusal to pay benefits was unreasonable to a jury). The Court concludes that the record contains a question of material fact as to the

17

reasonableness of United National's conduct that can only be resolved by the finder-of-fact. For this reason, United National's motion for summary judgment as to the City of Myrtle Beach's second cause of action for bad faith is **DENIED**.

## CONCLUSION

For the reasons set forth herein, defendant United National Insurance Company's motion for summary judgment is, hereby, **DENIED**. (Doc. #55).

**IT IS SO ORDERED**.

s/ Terry L. Wooten  
United States District Judge

September 13, 2010  
Florence, South Carolina